[Cite as *Trumbull Corp. v. Ohio Dept. of Transp.*, 2011-Ohio-6863.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

**TRUMBULL CORPORATION, et al.,**　　　　**Case No. 2011-06943**

　　**Plaintiffs,**

　　**v.**　　　　　　　　　　　　　　**Judge Joseph T. Clark**

**OHIO DEPARTMENT OF TRANSPORTATION,**

　　**Defendant.**　　　　　　　　　**DECISION**

{¶1} Trumbull-Great Lakes-Ruhlin, a joint venture (TGR),[1] filed a complaint alleging breach of contract and seeking both injunctive and declaratory relief against defendant, Ohio Department of Transportation (ODOT). On May 10, 2011, the court denied TGR's motion for a temporary restraining order. A trial on the merits was held on July 7-8, 2011, and reconvened on August 10, 2011.

{¶2} This case involves a $200 million public improvement project known as the I-71/I-670 Interchange Improvement Project. The award of a contract to design and build the project is subject to the competitive bidding laws of this state. The project is more than twice the size of any previous project completed by ODOT.

{¶3} Given the scope of the project, the relatively small number of contractors capable of designing and building such an improvement, and the costs associated with developing and submitting a technical proposal, ODOT accepted proposals from three contractors who had been "short-listed" pursuant to a pre-qualification process which is

---

[1]Plaintiffs shall be referred to collectively as TGR throughout this decision.

not at issue.   Those three contractors were TGR, Kokosing Construction Co., Inc. (Kokosing), and Walsh Construction Company, Inc.[2]

{¶4} The process by which ODOT was to select the design/build team (DBT) is set forth in the numerous contract documents.  In a nutshell, once the short-listed DBTs are selected, the next stage of the selection process requires the submission and review of each DBT's "Technical Proposal."  The Technical Proposals from each of the three DBTs were to be reviewed and then scored by several teams of ODOT employees pursuant to a specialized, multi-faceted scoring system.  Thereafter, the price proposals would be unsealed and ODOT would select the DBT whose total proposal represented the "best value" to the state.[3]

{¶5} A significant provision in the agreement states that any short-listed DBT that survives the rigorous bid process, but does not win a contract, is entitled to a bid stipend from ODOT of up to $500,000 in consideration for its participation.[4]

{¶6} On the day prior to the opening of the price proposals, TGR was notified by ODOT that its Technical Proposal had been deemed "non-responsive" and that the scoring of the proposal had ceased.  As a result, TGR's Technical Proposal was never

---

[2]Kokosing's motion to intervene in this case was denied.

[3] Selection Criteria (SC) 3.3 states that "[t]he Director has final authority to determine the best interests of the department and may reject any or all Technical/Price Proposals."

[4]The relevant contract language concerning the award of the stipend is found in the Project Scope (PS) and provides as follows:

"NEW NOTE - PAYMENT FOR PREPARATION OF RESPONSIVE PRELIMINARY DESIGN CONCEPT

"Subject to the conditions listed in this note, the Department will provide a payment of $500,000 or the DBT's [Design/Build Team] actual costs of preparing the responsive preliminary design concept, whichever is less, to each non-winning short-listed DBT.

"* * *

"By submitting its Technical Proposal for this Project, the DBT forms a contract and agreement for its technical proposal and conceptual design with the Department, the terms and conditions of which are outlined in the documents referenced in Revised Specification 105.04." (Emphasis original.)

given a cumulative score, its price proposal was never opened, and ODOT withheld TGR's bid stipend.

{¶7} The price proposals of the two surviving contractors were opened and Kokosing's proposal was determined by ODOT to be the best value. A design/build contract has been executed and work has begun on the project.

## BREACH OF CONTRACT

{¶8} TGR alleges that ODOT violated the terms of the contract when it deemed TGR's Technical Proposal non-responsive. According to TGR, its proposal should have been fully scored, its price proposal opened, and its bid considered along with the other two DBTs. TGR further alleges that even if it would not have been selected as the design/build contractor for the project, it was entitled to receive a $500,000 bid stipend.

{¶9} The parties agree that the stipend is not payable to a DBT where the DBT's Technical Proposal is non-responsive to the bid documents in a material respect. The relevant provision regarding "Responsiveness" is found at section 3.2 of ODOT's Selection Criteria (SC) and it reads as follows:

{¶10} "3.2 RESPONSIVENESS

{¶11} "A Technical Proposal may be deemed non-responsive at the sole discretion of the Director if any of the following apply:

{¶12} "1. The Technical Proposal fails to achieve a total score of at least 70 points; not including bonus points.

{¶13} "2. The Technical Proposal receives a score of less than 60 percent of the available points in any one of the Evaluation Criteria (A through I) listed in Section 4.11.

{¶14} "3. The Technical Proposal receives a score of less than 70 percent of the available points in three or more of the Evaluation Criteria listed in Section 4.1 (A through I).

{¶15} "4. The Project Duration listed in the bidder's Technical Proposal (see Section 4.13) is in excess of 183 weeks (42 months).

{¶16} "5. The Technical Proposal does not respond to the bid documents in a material respect." (Emphasis added.)

{¶17} TGR argues that the Director violated the parties' agreement inasmuch as TGR's Technical Proposal responds to the bid documents in all material respects.

{¶18} According to both the contract documents admitted into evidence and the witness testimony, the decision to declare TGR's Technical Proposal non-responsive was based upon ODOT's determination that the proposal materially deviated from the Interchange Modification Study (IMS) and the Step 7 Engineering Plans (Step 7 Plans) such that the proposal represented a change to the "basic configuration."

{¶19} The Project Scope (PS) identifies the IMS and the Step 7 Plans as being part of the "basic configuration." PS section 1.4 provides in relevant part:

{¶20} "The Project Scope in its entirety along with elements of the Preliminary Engineering Plans, as indicated in this section, constitute the basic configuration. The design-build proposal shall be consistent with the basic configuration subject only to such changes as may have been approved by the Department in accordance with the Alternative Technical Concepts, as described in the Selection Criteria document.

{¶21} "The following elements of the Preliminary Engineering Plans shall be considered as part of the basic configuration:

{¶22} "* * *

{¶23} "H. Interchange Modification Study documents, which include:

{¶24} "1. Interchange Modification Study (revised July 26, 2010) (Appendix RD-01A)

{¶25} "2. Addendum to the Interchange Modification Study (August 13, 2010) (Appendix RD-01B)

{¶26} "3. Appendices for the Interchange Modification Study (Appendix RD-02)."

{¶27} ODOT's conception of the basic design of the interchange is memorialized in the Step 7 Plans, and is depicted in the schematic drawing of the proposed

interchange in the IMS.[5]  First and foremost, ODOT believed that the IMS and the Step 7 Plans required an interchange design whereby four lanes of traffic were to enter from the west. In the IMS, there were to be two lanes each for I-670 and I-71; the I-670 traffic, occupying the left two lanes (lanes 1 and 2) was to continue through the interchange east to the Port Columbus airport; the two lanes for I-71 (lanes 3 and 4) were to occupy the right portion of the four-lane roadway with the traffic on those two lanes diverging to the right at the interchange and then exiting north and south.[6]

{¶28} In the TGR Technical Proposal, as evidenced by the schematic drawing admitted into evidence as part of TGR's Exhibit B-1, and as described by TGR's witnesses, the  interchange design shows I-71 in the two left lanes (lanes 1 and 2). Those two lanes  continue straight through the interchange and later exit north and south.  The right two lanes are dedicated to I-670 (lanes 3 and 4) and these two lanes diverge to the right at the interchange and then continue east toward the airport.

{¶29} The current configuration of the interchange is evidenced by several photographs admitted into evidence (Defendant's Exhibits 12-A through 12-G), a schematic drawing (Plaintiffs' Exhibit II), and the description provided by a number of witnesses.  In the current configuration, there are a total of five lanes that converge in the interchange from left to right as follows: one lane for I-71 South; one lane for Broad Street; one lane for I-71 North; one lane for I-670 East to the airport; and one lane for Cleveland Avenue.

{¶30} In the existing interchange, an eastbound motorist traveling in the left lane of the five-lane roadway, and desiring to reach I-670 East to the airport is required to cross two lanes of traffic and merge onto I-670 in a relatively short stretch of roadway on a vertical curve; three lanes must be crossed to reach Cleveland Avenue.  The witnesses referred to this particular stretch of the interchange as a "weave."  The current configuration of the interchange provides just one lane for I-670 East to the airport.

---

[5]The contract "document inventory" identifies both the "step seven plans" and the "IMS" as contract documents and the court finds that such documents were part of the contract.

[6]ODOT also believed that the IMS required a dedicated exit ramp to Jack Gibbs Boulevard.  The evidence does not convince the court that this deviation from the IMS, by itself, would have rendered the TGR

{¶**31**} ODOT believed that such a configuration created unnecessary congestion in the interchange and ODOT desired a new design that would both alleviate the congestion and improve safety. It is also clear from the testimony of several of the ODOT representatives involved in this project that ODOT wanted a design in which the left two lanes of the interchange were dedicated to I-670; that such lanes would continue through the interchange; that the next two lanes to the right would be dedicated to I-71 (lanes 3 and 4), and that such lanes would diverge to the right.

{¶**32**} TGR hired Parsons Transportation Group, Inc. (Parsons), an engineering consulting firm located in Louisville, Kentucky, to develop a Technical Proposal for the project. Steve Nicase is employed by Parsons as a civil engineer and he is licensed in Ohio, New York, Kentucky, Michigan, Georgia, and the District of Columbia. He is also a member of the American Association of State Highway and Transportation Officials (AASHTO). Nicase was Parsons' design manager for the TGR project, which meant that he was responsible for every aspect of the technical work, including the work of drafting the Technical Proposal. Had TGR been awarded the design/build contract for this project, Nicase would have worked on the roadway design team.

{¶**33**} Nicase testified that TGR's design, as evidenced by its Technical Proposal, met or exceeded all relevant AASHTO and ODOT design requirements; that it met or exceeded all the requirements of the Project Scope; and that it met or exceeded all relevant operational safety requirements.

{¶**34**} According to Nicase, ODOT's criticism of the configuration of the interchange in the Technical Proposal is misplaced in that the TGR design calls for two continuous lanes each for I-670 and I-71. Furthermore, the TGR design eliminated the weave at the interchange involving the traffic entering from Cleveland Avenue, which Nicase believed to be the primary deficiency in the existing design. Nicase insisted that

Technical Proposal non-responsive. Consequently, the merit of this portion of the Technical Proposal

there exist no geometric or route continuity deficiencies in the I-670 lanes as proposed by TGR and that the TGR-proposed design met all operational and safety requirements of the Step 7 Plans. Nicase also believed that the TGR design would require fewer ramps and bridges than were shown in the IMS which would result in significant time and cost savings to ODOT.

{¶35} With regard to the configuration of the interchange, Nicase testified that TGR relied upon the section of ODOT's Location and Design Manual (L&D) for converging roadways and exit ramps. Section 5.5 of the L&D manual provides, in general, that a "preferential flow" of traffic should be given to the more significant roadway and that the less significant roadway should diverge to the right. In TGR's opinion, I-670 is the less significant roadway inasmuch as the traffic flow on I-670 is lower than it is on the two lanes of I-71. Thus, the TGR design gives preferential flow to I-71 which means that the two lanes of I-71 proceed straight through the interchange and the two lanes of I-670 diverge to the right.

{¶36} When asked upon cross-examination whether section 5.1 of the L&D manual, which applies to diverging roadways and exit ramps, was the more appropriate standard to apply, Nicase opined that an application of either section of the L&D manual would result in the same conclusion given the requirements of preferential flow.

{¶37} At a meeting on January 20, 2011, TGR and the other short-listed contractors were told that, due to the relatively tight time parameters for choosing a DBT, changes to the basic configuration as set forth in the Project Scope would not be permitted. Nicase testified that, by that point in time, TGR had performed roughly 60 percent of the engineering work required to complete the technical proposal and that he and others on his team had begun drafting the Technical Proposal.

{¶38} SC Section 6.0 speaks to Alternative Technical Concepts in relevant part as follows:

{¶39} "6.1 DEFINITION

{¶40} "An Alternative Technical Concept (ATC) is a change to the Project Scope which provides a solution that is equal to or better than what is required by the scope as determined by the Department. The ATC process allows for innovation, increased

---

was not the focus of the parties in this litigation.

flexibility, time reductions and cost savings to ultimately obtain the best value for the public.

{¶41} "ATCs are not intended to replace pre-bid questions.

{¶42} "6.3 EVALUATION OF ATCS

{¶43} "ATCs are accepted by the Department at its discretion and the Department reserves the right to reject any ATC submitted.

{¶44} "The Department will attempt to evaluate all ATCs within 14 calendar days of receipt. However, this timeframe cannot be guaranteed, particularly for complex or unusual concepts.

{¶45} "The Department will not consider any change that would require excessive time or cost for review, evaluation or investigation.

{¶46} *"Deviations which require a Design Exception, modifications to the approved Interchange Modification Study, or additional Right-of-Way will not be approved."* (Emphasis added.)

{¶47} The italicized language is consistent with the other relevant provisions of the contract. For example, PS 1.4 states that "[t]he design-build proposal shall be consistent with the basic configuration subject only to such changes as may have been approved by the Department in accordance with the ATC's, as described in the SC document." PS 10.4 describes a design exception related to the posted speed limit but also states: "No other design exceptions permitted."

{¶48} Clearly, the IMS is part of the "basic configuration," and the basic configuration is part of the "project scope." Inasmuch as an ATC "is a change to the Project Scope," any ATC will likely result in a change to the basic configuration. Thus, the only reasonable reading of the contract is that an ATC is not an option for this project. In fact, when TGR sought approval for an ATC with respect to another aspect of the design, the request was rejected by ODOT.

{¶49} That is not to say that alterations to the basic configuration were never permitted on this project. In fact, PS 10.1, titled "Governing Regulations," provides:

{¶50} "The DBT shall be aware of the approved Interchange Modification Study (IMS) included in Appendices RD-01 (A & B) and RD-02. The IMS was approved as a basis for the design of this project. It contains the operational aspects and the roadways in the project. The DBT has the option to modify the design of the project with regard to adjustments to the physical design and/or function within the limitations provided in Section 10.2. These adjustments shall not affect the operation or safety aspects of the design established in the IMS."

{¶51} PS 10.2 provides in relevant part:

{¶52} *"10.2.4                                   Adjustments to Step 7 Engineering Plans*

{¶53} "Adjustments to the horizontal and vertical alignments will be allowed without being considered a change to the basic configuration provided they meet the following requirements, and are consistent with Section 1.14:

{¶54} "1. *Adjustments shall conform to the lane arrangements in the Step 7 Engineering Plans.*

{¶55} "* * *

{¶56} "7. Changes requiring design exceptions other than those listed in Section 10.4 will not be permitted." (Emphasis added.)

{¶57} When Nicase was asked upon cross examination if TGR had questioned whether its own design met the requirements of the IMS, he stated that the TGR design team consulted with its own engineering subcontractor, URS Corporation (URS), to get a second opinion on the issue. According to Nicase, after receiving a report from URS, he double-checked the relevant calculations and then determined that an ATC would not be required. Nicase had previously concluded that TGR's Technical Proposal complied with all operational and safety requirements of the Step 7 Plans and that, in his opinion, TGR's design represented an allowable adjustment to the basic configuration. Thereafter, TGR made the decision to go forward with the design.

{¶58} Adam Belasik is employed by Trumbull Corporation and he has a bachelor's degree in Civil and Environmental Engineering. If TGR had been awarded a contract for this project, Belasik would have been TGR's construction manager/project

administrator. Belasik explained that in a typical public improvement project the owner hires a design architect who turns the owner's conceptional plan into a finished design complete with a fixed construction schedule. Once the design and schedule are completed the owner employs the competitive bidding process in selecting a construction contractor or contractors to build the roadway. By contrast, in a design/build project such as the one involved in this case, a single contractor performs both of these functions. In this particular project, in addition to the countless miles of roadway and ramps that were to be constructed or reconstructed, 20 bridges were to be built, retaining walls were to be erected and micro tunneling was necessary.

{¶59} Belasik strongly disagreed with ODOT's assertion that the TGR proposal was essentially the same design as the current interchange. The only explanation for ODOT's criticism of TGR's design, in Belasik's opinion, was the fact that the two lanes of I-670 were to the right rather than the left. Belasik was adamant that TGR's design did not alter the basic configuration of the project. In his opinion, a modification such as the one made by TGR was contemplated by the Step 7 Plans. According to Belasik, TGR's modification was an allowable adjustment to the basic configuration pursuant to PS 10.2.4 and 1.4, inasmuch as the adjustment had no impact on the operational use or safety of the interchange.

{¶60} In defense of its decision to declare TGR's bid non-responsive, ODOT presented the testimony of Brad Jones and James Young. Young has been the Deputy Director of ODOT's Division of Engineering since 2001 and he was a member of the Executive Committee which reported to the Director as necessary on this project.

{¶61} Based upon the evidence in this case, the court finds that Young was the driving force behind ODOT's decision to declare TGR's bid non-responsive. He reviewed TGR's Technical Proposal as a non-voting member of the committee and he formed an opinion that TGR had impermissibly deviated from the IMS in that lanes 3 and 4 led to I-670 East rather than lanes 1 and 2. According to Young, such a change

in both the origin and destination of these four lanes undermined the route continuity shown in the IMS.

{¶62} Following the oral interview with TGR, which is a mandatory part of the selection process, Young remained convinced that the TGR Technical Proposal required a change to the basic configuration of the project and that it was an interchange design that ODOT "would never build." Young subsequently reported to the Director that the TGR design did little to alleviate the problems in the interchange and that the disruption in lane continuity would disturb ODOT's plans to use certain lanes as detours when the project continued beyond the interchange. On cross-examination, Young admitted that he had formed no opinion whether the TGR Technical Proposal violated standards of AASHTO, the Ohio Highway Design Manual, or ODOT's L&D manual. He was also unaware of any violations of relevant engineering or safety standards.

{¶63} Jones holds the title of ODOT Mega Projects Engineer. He testified that the value- based selection process employed by ODOT on this project represented a "non-traditional" approach to competitive bidding for a public improvement. According to Jones, ODOT selected a design/builder from the short-listed DBTs based upon three distinct elements of each bid: cost, design, and timeliness. According to Jones, after concerns about TGR's Technical Proposal were voiced by Young, he referred the matter to ODOT's geological specialist, the Federal Highway Administration (FHWA), and MS Consultants for review of TGR's Technical Proposal. However, no documents memorializing any of the work performed by these consultants were admitted into evidence.

{¶64} Jones admitted that he relied upon Young's opinion on issues regarding the basic configuration and that he was not qualified to determine whether TGR's design required an ATC or whether it was an allowable adjustment to the Step 7 Plans. Jones knew that Young was part of the ODOT Technical Proposal Committee but that Young was not authorized to perform any scoring of the Technical Proposals. He was not certain of Young's particular qualifications. According to Jones, on April 4, 2011, ODOT's Technical Review Group determined that TGR's bid was non-responsive and it

was decided that the group would make no recommendation to the Director regarding the TGR bid.

{¶65} The testimony in this case makes it clear that a misunderstanding as to the meaning and importance of such terms as "lane arrangement" and "route continuity" played a significant role in the events that led to this action. The terms "alignment of the lanes" and "lane assignments" were also a source of confusion.

{¶66} The term route continuity is not defined in the contract. ODOT, however, submitted a portion of an AASHTO publication which speaks to "route continuity" through interchanges. (Defendant's Exhibit 14-A.) The AASHTO publication discusses the principle of route continuity in relevant part as follows:

{¶67} "Route continuity refers to the provision of a directional path along and throughout the length of a designated route. The designation pertains to a route number or a name of a major highway. Route continuity is an extension of the principle of operational uniformity coupled with the application of proper lane balance and the principle of maintaining a basic number of lanes.

{¶68} "The principle of route continuity simplifies the driving task in that it reduces lane changes, simplifies signing, delineates the through route, and reduces the driver's search for directional signing.

{¶69} "Desirably, the through driver, especially the unfamiliar driver, should be provided a continuous through route on which changing lanes is not necessary to continue on the through route.

{¶70} "In the process of maintaining route continuity, particularly through cities and bypasses, *interchange configurations need not always favor the heavy movement but rather the through route*. In this situation, heavy movements can be designed on flat curves with reasonably direct connections and auxiliary lanes, equivalent operationally to through movements." (Emphasis added.)

{¶71} Although ODOT is correct in its assertion that the preferential flow need not be given to I-71 in order to preserve route continuity through the interchange, the AASHTO standard does not require that I-670 be the "through route."  In the TGR design, there are still two lanes for I-670 as it diverges from I-71 and continues east; there are no other routes exiting or entering on the left.  In other words, the fact that the IMS calls for an interchange configuration that is faithful to the principle of route continuity does not mean that TGR's design is not also faithful to the principle.

{¶72} ODOT witnesses testified that the IMS emphasized lane continuity over traffic flow, meaning that the two continuous lanes of I-670 were to be given preferential treatment through the interchange even though the two I-71 lanes were to handle a greater volume of traffic.  ODOT did not believe that TGR's design, which afforded preferential flow to I-71 pursuant to ODOT's L&D manual, could be reconciled with the IMS.

{¶73} The term "lane arrangement" is also undefined in the contract documents.  ODOT maintains that the term refers to the relative positions of the lanes as they flow through the interchange.  Jones testified, however, that he was not sure of the meaning of the term "lane arrangements" as used in PS 10.2.4 and he acknowledged that the term "lane assignment" was not used in defining the project scope.  In fact, Jones stated that he uses the two terms interchangeably.  Nicase stated that the term "lane arrangement" is used in the AASHTO "green book" in reference to the basic number of lanes in an interchange; that the number of lanes in the TGR design is the same number called for in the IMS.

{¶74} Section C.3.1 of TGR's Technical Proposal, states:

{¶75} "A key provision of Section 10.2.4 is that adjustments shall conform to the lane arrangement in the Step 7 Plans.  Carefully comparing the Step 7 Plans with TGR's overall plan layout * * * shows that our adjustments do not change any of the tie-in points at the west, south, east, and north limits of the project.  We provide the exact same lane arrangement as the Step 7 Plans by maintaining all of the ramp terminal locations, the numbers and purposes of lanes on each approach, and the locations where they tie in."

{¶76} Belasik agreed that the term lane arrangement referred to the basic number of lanes running from point A to B through the interchange. He also understood that alterations could be made to the alignment of lanes pursuant to PS 10.2.4.

{¶77} Based upon the totality of the evidence, and in assessing the witnesses' competency and credibility, the court finds that Nicase was the most knowledgeable and credible witness in this case. The court further finds that ODOT's preconceived notion of how the interchange was supposed to look, and how it was not supposed to look, interfered with ODOT's ability to objectively evaluate TGR's Technical Proposal. Ultimately, the court is convinced that the Technical Proposal was faithful to the project scope, the basic configuration, the Step 7 Plans, and the IMS, even though it was clearly at odds with ODOT's subjective expectations. As noted above, allowable adjustments to the basic configuration and Step 7 Plans were expected and, in fact, required by the project scope. The court finds that the shift in the relative positions of the two lanes of I-670 and I-71 was an allowable adjustment to the basic configuration.

{¶78} Although the TGR interchange design has some of the same general characteristics as the current interchange, TGR established that its design alleviates congestion and improves safety. Contrary to the assertions of ODOT's employees, the interchange is not the same design as the current configuration. Rather, the TGR design represents a significant improvement to the interchange in that the design provides two lanes each for I-670 and I-71 and has mitigated the troublesome weave.

{¶79} Moreover, based upon the testimony of the ODOT witnesses in this case and upon review of the voluminous contract documents admitted into evidence, the court finds that the primary goal of ODOT's new design/build concept and best value selection process is to shift the burden and expense of developing a finished design from ODOT to the contractor who will ultimately construct the project. Indeed, as evidenced by the testimony of a Kokosing representative, the design aspect of its work on this project did not end with the submission of the Technical Proposal. Additionally,

ODOT has represented to the court in its post-trial brief that only 25 percent of the design function is completed prior to ODOT's request for Technical Proposals; that another 25 percent of the design function is completed by the DBTs upon submission of the Technical Proposal; and that the remaining 50 percent of the design function is completed by the chosen DBT as the work on the project progresses. Under such circumstances, it is reasonable to expect that the Technical Proposals of the short-listed bidders will likely differ substantially from one another and that such proposals may not mirror the schematic drawing in the IMS.

{¶80} Hand in hand with the design/build approach, the best value selection process provides the Director with the opportunity to critically evaluate the Technical Proposals of several DBTs, while retaining the discretion to reject Technical Proposals that are both responsive and less costly. While it is understandable that ODOT wishes to withhold payment for a design that it "would never build," the parties' agreement requires the payment of either a $500,000 stipend or TGR's actual costs, whichever figure is lower.

{¶81} TGR has presented evidence which, if believed, would support a finding that TGR's actual bid preparation costs exceed two million dollars. However, the parties' agreement requires that such expenses be submitted to ODOT and then be audited by the Ohio Department of Administrative Services, to determine whether such expenses are truly compensable, before the stipend becomes due and payable.

{¶82} Accordingly, judgment shall be rendered in TGR's favor on the claim for breach of contract in an amount to be determined at a future proceeding following the timely completion of the above-mentioned audit.

**INJUNCTIVE RELIEF**

{¶83} As a general rule, injunctive relief is not available where the plaintiff has an adequate remedy at law. See *Haig v. Ohio State Bd. of Edn.* (1992), 62 Ohio St.3d 507, 510. Although the court has determined that TGR has a remedy at law in the form of stipulated contract damages, TGR argues that the stipulated damages are grossly inadequate inasmuch as the actual cost to TGR of preparing its bid are well in excess of two million dollars.

{¶84} Ordinarily, liquidated damage provisions are enforceable provided certain conditions exist. First, the amount of actual damages must be uncertain and difficult to prove. Second, the amount of stipulated damages must be reasonable and proportionate to the contract as a whole. Third, the parties' intent to stipulate to damages must be clear and unambiguous. See *Samson Sales, Inc. v. Honeywell, Inc.* (1984), 12 Ohio St.3d 27;

{¶85} *Lake Ridge Academy v. Carney* (1993), 66 Ohio St.3d 376.

{¶86} The circumstances surrounding the parties' agreement convinces the court that the stipulation regarding damages is enforceable. It is clear from the volumes of evidence submitted in support of TGR's bid preparation costs, that actual damages will be difficult to prove with certainty. It is also clear that the parties understood that the stipulated amount was made part of the parties' agreement in order to help defray costs incurred by the short-listed DBTs in preparing the bid, but not necessarily to provide complete relief. The corporate entities that make up the joint venture known as TGR understand that there will be costs incurred in the pursuit of public contracts and that there are no guarantees that a contract will be awarded to cover those costs. Such losses are a cost of doing business. Thus, the court finds that the stipulated damages are enforceable and that TGR has an adequate remedy at law.

{¶87} However, even if the court were to conclude that the stipulated amount is so grossly inadequate as to leave TGR with no meaningful relief, TGR has failed to prove that it is otherwise entitled to an injunction. TGR seeks an injunction compelling ODOT to reconsider its bid and award a contract to TGR.

{¶88} In general, courts will consider the following factors in deciding whether to grant injunctive relief: (1) the likelihood or probability of a plaintiff's success on the merits; (2) whether the issuance of the injunction will prevent irreparable harm to the plaintiff; (3) what injury to others will be caused by the granting of the injunction; and (4)

whether the public interest will be served by the granting of the injunction. *Cleveland v. Cleveland Elec. Illuminating Co.* (1996), 115 Ohio App.3d. 1.

**{¶89}** Although the court has determined that ODOT's decision to deem TGR's bid non-responsive was based upon an erroneous finding that the Technical Proposal failed to comply with the bid documents in a material way, the court is not convinced that injunctive relief would have prevented the harm to TGR. As set forth above, the evidence demonstrates that ODOT would never have awarded the contract to TGR inasmuch as ODOT was unequivocally opposed to building an interchange in the configuration dictated by the TGR Technical Proposal. As noted above, under the best value selection process, ODOT was under no obligation to choose TGR as the design/builder even if its Technical Proposal achieved the highest score.

**{¶90}** Moreover, it is absolutely clear from the evidence presented that the injury to both Kokosing and ODOT will be great should the court grant the injunction, and that the harm to the traveling public will be substantial. The testimony establishes that the project is well underway and that both Kokosing and ODOT have, as of the date of trial, incurred considerable expense in connection with the project. The evidence also convinces the court that an order enjoining work on the project and compelling ODOT to reconsider TGR's bid will unreasonably delay the project and irretrievably alter its scheduled completion date. As this contract represents just the first phase of a multi-phase project, the interests of the traveling public in the orderly and timely completion of the work weigh heavily against the issuance of an injunction.

**{¶91}** In short, TGR has not demonstrated a right to injunctive relief by clear and convincing evidence. Accordingly, judgment shall be rendered in favor of ODOT as to that claim.[7]

**SPOLIATION CLAIM**

**{¶92}** The evidence establishes that a relatively large number of documents, including partially completed scoring records for TGR's Technical Proposal, were removed from ODOT headquarters upon advice of counsel on or about May 11, 2011. There is no dispute that the parties were involved in litigation at that point in time, TGR

having filed its complaint in this court on May 4, 2011. TGR claims that the destruction of documents was designed to prevent TGR from discovering evidence relevant to its case. Specifically, TGR alleges that notations made by the individual members of ODOT's evaluation teams would rebut ODOT's claim that TGR's technical proposal was "unscoreable."

{¶93} The elements of a claim for interference with or destruction of evidence, otherwise known as spoliation, are 1) pending or probable litigation involving the plaintiff, 2) knowledge on the part of defendant that litigation exists or is probable, 3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, 4) disruption of the plaintiff's case, and 5) damages proximately caused by the defendant's acts. See *Smith v. Howard Johnson Co., Inc.*, 67 Ohio St.3d 28, 29, 1993-Ohio-229, citing *Viviano v. CBS, Inc.* (1991), 251 N.J.Super. 113, 126, 597 A.2d 543, 550.

{¶94} Given the court's determination that TGR's Technical Proposal was responsive, it is difficult for the court to believe that ODOT disrupted TGR's case in a meaningful way. Moreover, ODOT's subjective belief that TGR's technical proposal was "unscoreable" was not dispositive of the outcome of this case. Accordingly, to the extent that TGR has asserted a claim for spoliation, such claim is without merit.

{¶95} Based upon the foregoing, judgment shall be rendered in favor of TGR as to the claim for breach of contract in an amount to be determined at a future proceeding following the timely audit as contemplated by the contract. Judgment shall be rendered in favor of ODOT as to the claims of injunctive relief and spoliation of evidence.



[7]T_____ 4, 2011 motion to dismiss TGR's claim for injunctive relief is DENIED as moot. Similarly, T_____ 17, 2011 motion to strike evidence of an offer of compromise is also DENIED as moot.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

**TRUMBULL CORPORATION, et al.,**          **Case No. 2011-06943**

     **Plaintiffs,**

     **v.**          **Judge Joseph T. Clark**

**OHIO DEPARTMENT OF TRANSPORTATION,**

     **Defendant.**          **JUDGMENT ENTRY**

{¶96} This case was tried to the court on the merits. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment shall be rendered in favor of plaintiffs as to the claim for breach of contract in an amount to be determined at a future proceeding following the timely audit as contemplated by the contract. Judgment shall be rendered in favor of defendant as to the claims of injunctive relief and spoliation of evidence.

_____
JOSEPH T. CLARK
Judge

cc:

Andrew J. Natale
2500 Key Center
127 Public Square
Cleveland, Ohio 44114-1230

Jeffrey L. Maloon
William C. Becker
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Filed November 15, 2011
To S.C. reporter December 30, 2011